IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAUL D. BLOOM                    *

                                 *

     v.                          CIVIL NO. SKG-08-827

                                 *

MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY  *

                                 *

          *    *    *    *    *    *    *

### MEMORANDUM OPINION

Plaintiff, Paul D. Bloom, by his attorney, Michael D. Steinhardt, filed this action for judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 401-434.[1]

This case has been referred to the undersigned magistrate judge for all proceedings by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.  (Papers No. 6, 21.)  Currently pending before the Court are cross motions for summary judgment.  (Papers No. 9, 20.)  No hearing is necessary in this case.  See Local Rule 105.6.  For the reasons discussed below, the Court AFFIRMS the decision of the Commissioner.  Accordingly, the Court DENIES plaintiff's Motion for Summary Judgment and GRANTS defendant's Motion for Summary Judgment.

---

[1] All citations to the U.S. Code and Code of Federal Regulations are to the 2006 editions, as the Administrative Law Judge issued his decision in 2006.  Any changes to these authorities are noted where applicable.

I.  Procedural History

Mr. Bloom filed an application for a Period of Disability[2] and for DIB[3] on September 24, 2002, alleging disability beginning February 12, 2002, due to a combination of impairments, including pulmonary disease and emotional disorders.  (R. 39-40.)  The Administration denied the application both initially on November 27, 2003 (R. 41-43), and upon reconsideration on April 1, 2004 (R. 47-49).

On April 19, 2004, the claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  (R. 51.)  The claimant, represented by Mr. Steinhardt, appeared and testified at a hearing held on August 5, 2005, before ALJ Robert W. Young.  (R. 468-508.)  Before the hearing, Mr. Bloom amended the date of his alleged onset of disability to April 4, 2002; the alleged "closed period" of disability under 20 C.F.R. § 404.321 is therefore April 4, 2002, to November 4, 2003 -- the day he returned to work.  (R. 51.)  On April 28, 2006, the ALJ issued a decision finding the claimant not disabled under Sections 216(i) and 223(d) of the Act.[4]  (R. 13-25.)

Mr. Bloom thereafter filed a timely appeal with the Appeals Council and submitted additional evidence for consideration by the Council.  (R. 11-12, 8-10.)  On February 5, 2008, the Appeals Council denied the claimant's request for review (R. 5-7), rendering the ALJ decision the final decision of the Commissioner.  (R. 5.)

Plaintiff then timely filed the instant action in the District Court for judicial review of the ALJ decision, pursuant to 42 U.S.C. §

---

[2] See generally 20 C.F.R. §§ 404.320, 404.321.
[3] See generally 20 C.F.R. § 404.315.
[4] The corresponding current Sections are 416(i) and 423(d).

405(g).  (Paper No. 1.)  The transcript having been filed with the Court, the case is now ripe for summary judgment.

II.  Factual Background

Mr. Bloom, who was born on January 25, 1951, was 51 years of age at the beginning of the closed period (April 4, 2002) and 52 years and nine months of age at the end of the closed period (November 4, 2003). (R. 472.)  He is approximately five feet, seven inches tall and weighs about 250 pounds.  (R. 21.)  Mr. Bloom completed high school and three years of college, but has not undergone any vocational training.  (R. 473.)  He can read, write, and speak English.  Id.  Mr. Bloom resided with his wife, Elizabeth Bloom, during and before the period at issue. (R. 472.)  Before, during, and after this period, Mr. Bloom was owner and president of Paul Bloom Associates, Incorporated, an electronics supply company.  (R. 473-76.)  In this capacity, prior to the closed period, Mr. Bloom would travel through Maryland, Delaware, Virginia, and the District of Columbia to market his products.  (R. 476.)

Mr. Bloom's medical history during and around the closed period is examined in detail below, but the following is a general timeline of key facts.  Early in 2002, Mr. Bloom began experiencing difficulty breathing.  (R. 478.)  Soon thereafter, Mr. Bloom was diagnosed with sarcoidosis.[5]  (R. 21.)  He alleges that the medication that he took to treat the sarcoidosis caused various emotional disorders.  (R. 476.)

---

[5] Sarcoidosis is a chronic, progressive, systematic granulomatous disease of unknown cause, especially involving the lungs with resulting interstitial fibrosis, but also involving lymph nodes, skin, liver, spleen, eyes, phalangeal bones, and parotid glands.  Stedman's Medical Dictionary 1719 (28th ed. 2006).

A combination of these physical and emotional impairments allegedly rendered Mr. Bloom unable to work until November 2003.  (R. 477.)

Notably, the ALJ found that Mr. Bloom performed several tasks for his business during the closed period.  (R. 18-19.)  Specifically, the claimant entered into and amended an agreement which permitted him to continue receiving income, and he reversed a decision to enter into a business merger.  (R. 20.)  Mr. Bloom, however, claimed to have done nothing for his company during this period.  (R. 475.)  He was paid $213,389 in 2002 and $188,315 in 2003.  (R. 20.)  In addition, Mr. Bloom vacationed in Tennessee for a week in March 2003.  Id.

A.  Medical Evidence  (R. 83-464)

The following is a summary of Mr. Bloom's medical history during the closed period, organized in roughly chronological order.

1.  Sarcoidosis Diagnosis

In February 2002, Mr. Bloom saw Dr. Brian Bohner of Pulmonary and Critical Care Associates of Baltimore ("PCCAB"), complaining of wheezing, coughing, and chest tightness.  (R. 360.)  Dr. Bohner started Mr. Bloom on a course of Prednisone, a corticosteroid, among other medications.  (R. 357.)  The results of a bronchoscopy and a thorascopy performed at Greater Baltimore Medical Center ("GBMC") led to a diagnosis of sarcoidosis in April 2002.  (R. 346, 229, 217.)  Dr. Bohner noted that Mr. Bloom "is very limited in most activities" and that "walking around doing errands . . . he gets very dyspneic."  Id.

In May and June of 2002, Mr. Bloom experienced severe shortness of breath and continued chest pain.  (R. 327-36.)  He continued to see Dr. Bohner through 2002 and 2003 in connection with his sarcoidosis.

4

(R. 348-81.)  These notes reflect Mr. Bloom's ongoing complaints of chest pain, fatigue, malaise, and poor appetite.  (Id.; R. 22)

### 2.  Onset of Mental and Emotional Problems

Around the middle of 2002, Dr. Emile Bendit, Mr. Bloom's long-term treating psychiatrist, observed that Mr. Bloom had begun to experience various mental and emotional problems.  (R. 401-02.)  Dr. Bendit noted Mr. Bloom's "long-standing history of mood disorder with exacerbations and remissions," and concluded that Mr. Bloom developed a psychotic disorder secondary to his intake of Prednisone.  (R. 396.) In June 2002, Dr. Bendit observed that Mr. Bloom was "explosive," "edgy," "manic," and that he felt "like a zombie."  (R. 401-02.)  In July 2002, Mr. Bloom's condition worsened.  (See R. 402.)  He feared that his marriage would fail; he feared going out of business; and he experienced hallucinations, including hearing a voice telling him to jump off a balcony.  Id.  On July 31, 2002, Mr. Bloom was hospitalized due to these increased symptoms of psychosis and bipolar disorder. (R. 21, 124-33.)  He was released five days later.  Id.

### 3.  Cardiac Catheterization

In August 2002, Mr. Bloom was seen at Johns Hopkins Hospital, complaining of acute chest pain and shortness of breath.  (R. 289.) He underwent a cardiac catheterization, revealing "normal coronary anatomy with no evidence of coronary artery disease."  (R. 230.)

### 4.  Treatment Notes from Dr. Aucott

Dr. John Aucott treated Mr. Bloom through the end of 2002.  (R. 261-88.)  During this time, Mr. Bloom complained of various problems, including chest pain, nausea, headaches, fatigue, and pain in his

legs, hips, and abdomen.  Id.  Dr. Aucott opined that Mr. Bloom's steroid intake caused him to gain weight, which triggered the pain in his legs, hips, and abdomen.  (R. 274.)  On August 13, Dr. Aucott opined that Mr. Bloom was unable to work or carry or lift anything heavier than 15 pounds.  Id.  Dr. Aucott attributed this to the aggravation of Mr. Bloom's bipolar disorder as well as his leg, hip, and abdomen pain.  Id.  In an undated Medical Source Statement, Dr. Aucott opined that Mr. Bloom's sarcoid "has resulted in significant damage" to him; that Mr. Bloom remains physically and emotionally fragile"; that "he is unable to engage in physical activity for more than 2 hours without resting 1-2 hours"; that he "has difficulty maintaining concentration for prolonged periods of time"; and that Mr. Bloom "is medically prohibited from engaging in prolonged work activities (6 hours per day max)."  (R. 261.)

### 5.  Letter from Dr. Bohner dated October 16, 2002

In a letter dated October 16, 2002, Dr. Bohner provided an update as to Mr. Bloom's level of impairment resulting from sarcoidosis.  (R. 317-18.)  Dr. Bohner stated that, as of that date, Mr. Bloom continued to have impairment, although his symptoms had "somewhat stabilized." (R. 317.)  Furthermore, Mr. Bloom had "respiratory limitation even walking a distance of one block or more."  Id.  Dr. Bloom next opined as to Mr. Bloom's capacity to perform work:

> At this point, Paul is still unable to complete a full 8 hour day without significant periods of rest up to 1 or 2 hours at a time.  There is also confusion in his thought and difficulty in his speech because of the psychotic problems and because of the medications used to treat these problems.  I do not believe that there is any way that Mr. Bloom would be able to engage in a competitive work environment at this time.

(R. 318.)  Dr. Bohner then asked that Mr. Bloom have no periods of overexertion and avoid lifting objects greater than 20 pounds.  <u>Id.</u>

### 6.  Treatment Notes from Dr. Bendit

Mr. Bloom also continued to see Dr. Bendit through the end of 2002 and into 2003.  (R. 396-404, 439-64.)  In September 2002, Mr. Bloom had trouble thinking, focusing, remembering, and reading; he experienced a panic attack; he needed explicit directions for things; and he struggled to tell time.  (R. 403.)  In October 2002, Mr. Bloom still had difficulty concentrating; felt depressed; was not motivated; but was not suicidal.  (R. 403-04.)  In November 2002, Mr. Bloom felt more motivated but struggled to sleep.  (R. 404.)  In December 2002, Mr. Bloom had panic attacks in the middle of the night; his thinking was "still way off"; and he could not do math or "process things." <u>Id.</u>  In January 2003, Mr. Bloom felt "like he is falling apart" and continued to experience anxiety.  <u>Id.</u>  In February 2003, Mr. Bloom felt "tense all the time" and had trouble sleeping.  <u>Id.</u>  In March 2003, Mr. Bloom continued to feel anxious.  <u>Id.</u>

### 7.  Daily Activities Questionnaire

Mr. Bloom completed a Daily Activities Questionnaire on February 23, 2003.  (R. 98-103.)  During that time, he spent most of the day resting and always felt fatigued.  (R. 98.)  Mr. Bloom's wife helped him get dressed, and his son helped him shave.  (R. 102.)  He could not prepare his own meals, perform household chores, or go shopping. (R. 99.)  Mr. Bloom would sometimes read, although only for about 15 minutes at a time, and he struggled to understand what he was reading. (R. 101.)  He was not able to engage in any activity for longer than

two hours without resting.  (R. 103.)  He only got out of his house

three or four days per week, mostly to go to the office or visit

friends.  (R. 98-99.)  He also suffered from constant anxiety and

panic attacks as well as memory loss.  (R. 102.)  Finally, he slept

poorly and often had to take medication to help him sleep.  Id.

### 8.  Dr. Bendit's Report of March 18, 2003

In a Medical Source Statement dated March 18, 2003, Dr. Bendit

opined that Mr. Bloom's "mood is stable [and] thinking still fuzzy."

(R. 396.)  Mr. Bloom felt "slowed mentally and physically" and was

"not able to address complex issues."  Id.  However, Dr. Bendit also

opined that Mr. Bloom was "alert" and "oriented"; that he had only

"moderate anxiety [secondary] to regaining activities and functions";

and that he had "no gross cognitive deficits," hallucinations, or

delusions.  Id.  He further opined that Mr. Bloom had no restrictions

of daily activities; that he had no difficulty in social functioning;

and that he struggled to concentrate only insofar as "complex tasks"

were concerned.  Id.  Finally, Dr. Bendit concluded that Mr. Bloom was

"much better gradually but not fully back to previous level of

functioning -- maybe 75-80% back."  Id.

More than two years later, however, Dr. Bendit wrote a letter to

Mr. Steinhardt purporting to clarify the above report.  (R. 463.)  The

ALJ had requested that Dr. Bendit explain the conflict between his

March 2003 opinion and his April 2005 opinion, discussed below.  (R.

505.)  In his letter, Dr. Bendit opined as follows:

> [The March 18, 2003, report] was completed during the
> course of the illness, when Mr. Bloom was recovering but
> not fully recovered or stable.  He was improved relative to
> April 2002 but, in my judgment, it would not have been

8

medically appropriate to send him back to any type of work
for fear of setting back his recovery.  His difficulty in
thinking and concentration in March 2003 would have
prevented him from doing any type of work.  The report of
April 1, 2005 is based on a more complete picture of his
progress and recovery and is therefore more accurate.

(R. 463.)  Dr. Bendit's April 1, 2005, report is summarized below.

### 9.  Dr. Bendit's Treatment Notes from Early-to-Mid 2003

Dr. Bendit's actual treatment notes from early-to-mid 2003 -- as
opposed to his medical summary reports and related forms -- are quite
limited.  (See R. 461.)  In February, Dr. Bendit noted that Mr. Bloom
was "feeling tense all the time"; had nausea and anxiety; and had
difficulty sleeping.  Id.  In March, Mr. Bloom had anxiety and feared
his upcoming flight to Tennessee.  Id.  In April, Mr. Bloom felt "very
guilty"; slept a lot and avoided his wife; and felt "everything was/is
good."  Id.  In May, Mr. Bloom felt "scared," due largely to physical
complications.  Id.  In June, Mr. Bloom was worried and losing sleep,
largely at the prospect of undergoing a thoracotomy.  Id.  In July,
Mr. Bloom's cognitive function was "off a little"; his energy was
"off"; he had "no concentration"; and he felt depressed.  Id.

### 10.  Reports from Disability Determination Services

In May 2003, Mr. Bloom was examined by Dr. Bernard Karpers, Jr.,
of Maryland Disability Determination Services ("DDS").  (R. 382-86.)
In his report, Dr. Karpers noted that Mr. Bloom's lungs were clear;
that his vital signs were normal; that his heart sounded normal; and
that he had no neurological deficits.  (R. 385, 21.)  Dr. Karpers
concluded that Mr. Bloom "is able to sit, stand, walk, lift, carry,
handle objects, hear, speak and travel as necessary for activities of
daily living and medical care only."  (R. 386.)

In September 2003, another DDS physician evaluated Mr. Bloom. (R. 388-95.)  The physician concluded that Mr. Bloom was able to: lift and/or carry 20 pounds occasionally; lift and/or carry 10 pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull to an unlimited extent.  Id.  In addition, Mr. Bloom was able to occasionally climb, and frequently balance, stoop, kneel, crouch, and crawl.  Id. Finally, Mr. Bloom did not have any communicative problems.  Id.

In October 2003, Mr. Bloom underwent two more DDS evaluations. (R. 406-431.)  Dr. Robert Lehman, psychiatrist, noted that Mr. Bloom: had a "much improved" level of function; had "no looseness of associations"; was not experiencing hallucinations or delusions; did not feel depressed with regard to anxiety states; had only "some mild short-term memory impairment"; was only "slightly impaired" with regard to insights and judgments; had only a "mild" severity of psychosocial stressors; had only "some cognitive impairment"; was "functioning from a psychotic point of view fairly well"; and had "no problems with concentration."  (R. 406, 407, 412.)  The diagnosis was bipolar mania, rapid cycling, and steroid psychosis.  (R. 408.)  Dr. Lehman commented that he was "not sure what is going to happen when [Mr. Bloom] actually returns to work[.]"  Id.

Later that month, Dr. Robert Brown, a DDS psychologist, evaluated Mr. Bloom.  (R. 413-27.)  He opined that Mr. Bloom's impairment caused the following functional limitations: mild restrictions of activities of daily living; mild difficulties in maintaining social functioning;

moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration.  (R. 424.)  Dr. Brown concluded that Mr. Bloom did not satisfy the C criteria of the listings of impairments.  (R. 425.)

Dr. Brown also opined that Mr. Bloom was not significantly limited with regard to understanding and memory; not significantly limited to moderately limited with regard to sustained concentration and persistence; and not significantly limited with regard to social interaction and adaptation.  (R. 428-29.)

### 11.  Dr. Bendit's April 2005 Report

As indicated above, in April 2005 Dr. Bendit submitted a report summarizing his findings from April 2002 to November 2003.  (R. 439-62.)  In a Medical Source Statement dated April 1, 2005, Dr. Bendit noted that Mr. Bloom had poor to no ability to make occupational adjustments (i.e. follow work rules, function independently, and maintain attention/concentration); to make performance adjustments (i.e. understand, remember, and carry out job instructions); and to make personal-social adjustments (i.e. demonstrate reliability and behave in an emotionally stable manner).  (R. 440-41.)

Dr. Bendit also opined, in a Psychiatric Review Technique Form dated March 2005, that Mr. Bloom met Listing 12.02.  (R. 443.)  This was because Mr. Bloom had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration, according to Dr. Bendit.  (R. 453.)

11

B.  Hearing Testimony (R. 468-508)

On April 19, 2004, Mr. Bloom filed a timely request for a hearing before an ALJ.  (R. 51.)  The claimant, represented by Mr. Steinhardt, appeared and testified at a hearing held on August 5, 2005, before the ALJ.  (R. 468-508.)  Plaintiff's wife, Elizabeth Bloom, and Vocational Expert Jan Reed ("VE") also testified.  Id.  At the hearing, Mr. Bloom amended the date of his alleged disability onset to April 4, 2002; the alleged "closed period" of disability under 20 C.F.R. § 404.321 is thus April 4, 2002, to November 4, 2003.  (R. 51.)

1.  Examination of Mr. Bloom (R. 470-82)

First, the ALJ examined Mr. Bloom.  (R. 471-76.)  The claimant testified that, while he has never received any worker's compensation benefits, he did receive income as owner of his company during the closed period.  (R. 473-74.)  Mr. Bloom explained that he is still with the company, and that a merger which had been proposed during the closed period never occurred.  (R. 474.)  He further explained that as president of the electronics supply firm, Mr. Bloom employed fewer than a dozen people, and traveled throughout Maryland, Delaware, Virginia, and the District of Columbia to market his products.  (R. 475-76.)  Mr. Bloom testified that he "did nothing" for the business during the closed period.  (R. 475.)  Since November 2003, however, Mr. Bloom testified that he resumed "every duty that I did prior to April '02," including traveling "extensively."  Id.

Mr. Bloom's attorney, Mr. Steinhardt, next examined his client. (R. 476-82.)  First, however, he made some opening statements about the case.  (R. 476-78.)  Mr. Steinhardt explained that Mr. Bloom was

diagnosed with sarcoidosis in early 2002; was hospitalized at GBMC; was prescribed Prednisone; and then experienced a long-standing mental disorder in reaction to the medication. (R. 476.) He then explained that this disorder involved psychosis, hallucinations, depression, and mania. Id. Mr. Steinhardt stated that this condition lasted for more than a year, during which time Mr. Bloom could not work. (R. 476-77.) Mr. Steinhardt then acknowledged that Mr. Bloom had received payments from his company during the closed period, but stated that Mr. Bloom had not worked during that time. (R. 477.)

Mr. Bloom testified that in early 2002, he began to experience difficulty breathing. (R. 478-79.) In April 2002, Mr. Bloom was hospitalized at GBMC. (R. 479.) He underwent a thoracotomy so that the problem could be determined. Id. Mr. Bloom was given Prednisone to treat the sarcoidosis. Id. He remembered very little beyond that point because the medication caused him to feel mentally ill. (R. 479-82.) Specifically, he stated that "things started to change around me" and "I started hearing things and, voices, and I started becoming manic." (R. 479.) In July 2002 Mr. Bloom was hospitalized at Sheppard Pratt. Id. He stated that "I have no recollection of who I am or who I was at that point forward." (R. 480.) He was also unable to put together sentences during that time. Id.

Mr. Steinhardt then questioned Mr. Bloom about his capacity to perform business-related activities. (R. 480-82.) Mr. Bloom stated that he remembered returning to work in November 2003. (R. 480.) He testified that he was still not able to function at pre-closed period levels, but that he was able to perform some office duties. (R. 481.)

Mr. Bloom explained that during his absence, his accountant helped run the business, in addition to the rest of the staff.  Id.

### 2.  Examination of Mrs. Bloom  (R. 482-97)

Elizabeth Bloom, who is married to the claimant, testified next. (R. 482-97.)  She testified that during the closed period, her husband "basically couldn't function"; "was confused" and could not process information; "couldn't follow a conversation"; "couldn't do normal daily things" like dress himself, shave, go through the mail, or pay bills; and struggled to maintain balance.  (R. 483.)  She feared for his safety.  (R. 484.)  Mrs. Bloom said that these effects occurred shortly after Mr. Bloom began taking the Prednisone.  (R. 485.)

Mr. Steinhardt asked Mrs. Bloom what led her to take her husband to Sheppard Pratt in July 2002.  (R. 486.)  She stated that Mr. Bloom had heard voices in his head suggesting that he attempt suicide.  Id. For the rest of 2002, she said, Mr. Bloom was unable to resume normal activities.  (R. 488.)  In July 2003 her husband was "slowly coming back.  I mean, he wasn't himself, but he wasn't, like, out there?" (R. 488.)  However, she testified that Mr. Bloom was still unable to take care of some of his daily needs, such as driving.  Id.

Mrs. Bloom next testified concerning a meeting with Mr. Bloom's insurance agent.  (R. 489-90.)  Mrs. Bloom could not recall the exact date of the meeting, but stated that it occurred in 2002.  (R. 490.) She testified that Mr. Bloom "had no idea what they were saying" and that "he had no idea what was going on, couldn't comprehend one thing they were saying. . . .  It was like he wasn't even there."  Id.

The ALJ then asked Mrs. Bloom whether, when the merger talks were occurring (during summer 2003), Mr. Bloom was involved in any dealings or had any decision-making role.  (R. 492.)  She testified that he did have "some input."  Id.  She recalled at least one meeting between her husband and an attorney for the company.  (R. 493.)  Mrs. Bloom stated that Mr. Bloom was unable to focus and concentrate on business-related dealings, however, and that she did not know much about it.  Id.

The ALJ then picked up with the questioning.  (R. 494.)  He noted the discrepancy between Dr. Bendit's March 2003 reports, which stated that the claimant was 75 to 80 percent healed, and Dr. Bendit's 2005 reports, stating that he was doing much worse at that time (R. 497.)

### 3.  Re-examination of Mr. Bloom  (R. 497-501)

Mr. Bloom testified that he was able to drive again only after he returned to work, after the closed period ended.  (R. 498.)  Mr. Bloom next stated that he was able to dress himself again beginning in June or July of 2003.  Id.  He explained that he spent many of his days in 2003 "[j]ust staring the whole time."  Id.

Mr. Bloom then requested to clarify some of the comments made by his wife regarding his capacity to perform business-related activities during the closed period.  Id.  "I know she's confused," he testified.  Id.  He testified that since returning to work, he participated in a number of merger meetings; but that the meeting to which his wife had referred took place while he was ill and was set up by his associates, who thought a merger was in the best interests of Mr. Bloom's family.  (R. 499.)  Mr. Bloom acknowledged that he attended the latter meeting but stated that he had no input at that meeting.  Id.  "I sat there

15

and . . . it didn't matter whether I listened or not because I did not understand anything that was going on at the time," he stated.  Id. Mr. Bloom then testified that he had no recollection of being at that meeting.  (R. 500.)  "If [my wife] said that I actually spoke at that meeting . . . I don't think she knows a hill of beans because . . . I couldn't have spoken at that meeting because I wouldn't have known what I've said," Mr. Bloom testified.  (R. 501.)

### 4.  Examination of VE  (R. 501-04)

Vocational Expert Jan Reed testified next.  (R. 501-04.)  The ALJ asked the VE to classify Mr. Bloom's work (as the president and owner of his small business) in terms of the level of skills and exertion involved.  (R. 502.)  She testified that his work as a manufacturer's representative and a business owner is considered skilled and light, according to the Dictionary of Occupational Titles ("DOT").  (R. 502.)

The ALJ next asked the VE to assume a hypothetical individual of the same age, education, past work experience as the claimant; who has no exertional limitations for a full range of exertional activity; who therefore has only moderate difficulty in maintaining concentration, persistence, and pace; and who as a result is limited to routine, repetitive, simple tasks.  Id.  The VE testified that such a person could perform a number of jobs, including, at the medium level, stock clerk (of which there are 1,500 locally and 85,000 nationally); at the light level, mail clerk (of which there are 1,500 locally and 90,000 nationally); and at the sedentary level, order clerk (of which there are 1,000 locally and 90,000 nationally).  Id.

16

The ALJ next asked the VE to assume that Exhibit 11F is a correct reflection of Mr. Bloom's physical residual functional capacity, which would render Plaintiff able to: lift 20 pounds occasionally; lift 10 pounds frequently; stand/sit for about six hours; push and pull to an unlimited extent; climb occasionally; and balance, stoop, kneel, crouch, and crawl frequently.  Id.  The VE opined that such a person could perform light work, such as mail clerk, cashier (of which there are 3,000 locally and more than 200,000 nationally), or host (of which there are 4,000 locally and more than 200,000 nationally).  (R. 503.)

Mr. Steinhardt then questioned the VE.  (R. 503-04.)  He provided her with a copy of Exhibit 21F, Dr. Bendit's 2005 clarification of his March 2003 evaluation of Mr. Bloom.  (R. 503; 439-62.)  After reading the assessment, she stated, "That would preclude work."  (R. 503.)

### 5.  Plaintiff's Closing Statement  (R. 504-07)

Mr. Steinhardt went step-by-step through the sequential process, 20 C.F.R. § 404.1520(a), for determining whether an individual has a disability under the Act.[6]  (R. 504.)  First, Mr. Bloom was not engaged in "substantial gainful employment."  Id.  Second, the sarcoidosis and the ensuing emotional disorders are both severe impairments.  Id.  Third, Dr. Bendit, the treating physician, indicated that the claimant meets Listing 12.02 under 20 C.F.R. § 404, Subpart P, Appendix 1.  Id.  Fourth, Mr. Bloom could not have performed his previous employment. Fifth, Mr. Bloom could not perform any substantial gainful employment

---

[6] See § II-C, infra, for a complete analysis of what constitutes a "disability," as defined in the Act and corresponding regulations.

for the closed period, based on the limitations outlined in the
medical assessment form by Dr. Bendit.  (R. 504.)

Mr. Steinhardt next attempted to reconcile the discrepancy in Dr.
Bendit's March 2003 and 2005 reports.  (R. 505.)  He pointed out that,
even in March 2003, Dr. Bendit observed that the claimant's thinking
was "fuzzy" and that he was not able to address complex issues.  Id.
The ALJ stated that he still saw a significant difference in the two
reports.  Id.  He then told Mr. Steinhardt to obtain an explanation
from Dr. Bendit.  Id.  The ALJ stated that he would specifically like
to know whether Mr. Bloom could perform other work.  Id.

C.  ALJ Decision

The ALJ concluded that plaintiff was not under a "disability," as
defined in the Act and relevant regulations, during the closed period.
(R. 25.)  The Act defines "disability" as "inability to engage in any
substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period
of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In evaluating plaintiff's claim for DIB, the ALJ followed the
five-step process set forth in Section 14.1520 of the Code of Federal
Regulations.  20 C.F.R. § 404.1520.  Under this Section, a finding
that the claimant is disabled or not at a step ends the inquiry, but
if the ALJ cannot find that the claimant is disabled or not at a step,
he must go on to the next step.  Id. at § 404.1520(a)(4).

### 1.  Step One

At the first step, if the claimant has performed any "substantial gainful activity" during the period of alleged disability, he or she is not disabled.  Id. at §§ 404.1520(a)(4)(i), (b); see also id. at §§ 404.1510 ("Substantial gainful activity means work that (a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit"), 404.1572 (further defining the term).  The ALJ concluded that plaintiff was not currently engaged in any substantial gainful activity.  (R. 18-19.)  The ALJ noted that, as president of his own company, Mr. Bloom entered into an agreement with himself to continue receiving a salary.  (R. 18.)  Specifically, in November 2002 Mr. Bloom signed this agreement, and in September 2003 he modified it.  Id.  As a result, he was paid $233,389 in 2002 and $182,315 in 2003.  Id.  In light of this evidence, the ALJ observed:

> The fact that he had the authority to pay himself these amounts would [seem] to indicate that he continued to provide substantial services to the business.  Also the fact that these agreements could be perceived to be legal, tends to undercut the claimant's allegations that he was not mentally competent to perform any work activity.  If he was not mentally competent to work, how was he mentally competent to enter into these "binding" agreements?

Id.  Nevertheless, the ALJ gave Mr. Bloom "the benefit of the doubt," finding that "despite these very substantial payments, the claimant has not engaged in substantial gainful activity at any time relevant to this decision."  Id. at 19.  The ALJ's disposition of this step is not at issue on appeal.  (See Paper No. 9 at 5.)

### 2.  Step Two

At the second step, the claimant must demonstrate that he has an impairment or combination of impairments that is "severe."  20 C.F.R.

19

§§ 404.1520(a)(4)(ii), (c).  An impairment or combination thereof is "severe" if it significantly limits the claimant's ability to perform basic work activities.  <u>Id.</u>  The ALJ concluded that, during the period at issue, Mr. Bloom had the following severe impairments: sarcoidosis, affective disorder, and panic disorder.  (R. 19.)  This conclusion is not at issue on appeal.  (<u>See</u> Paper No. 9 at 5.)

### 3.  Step Three

At the third step, the claimant must establish that his impairment or combination thereof meets or equals the criteria of one of the impairments in the Listing of Impairments ("LOI"), found in 20 C.F.R. Part 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 404.1525, 404.1526.  The impairment or combination thereof must also satisfy the duration requirement of Section 404.1509.  <u>Id.</u> at § 404.1520(a)(4)(iii).  That is, it must last "for a continuous period of at least 12 months." <u>Id.</u> at § 404.1509.

The ALJ concluded that none of Mr. Bloom's impairments met or equaled a listed impairment.  (R. 19.)  The ALJ found that Mr. Bloom's mood disorder met the A criteria of Listing 12.04, and that his panic disorder met the A criteria of Listing 12.06.  (R. 19); <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1.  However, the ALJ found that Mr. Bloom did not meet the B criteria of these listings.[7]  <u>Id.</u>  Specifically, Mr. Bloom had only mild restrictions in activities of daily living;

---

[7] The B criteria for Listings 12.04 and 12.06 are identical.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1.  They require that the claimant have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.  <u>Id.</u>

moderate difficulties with social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and one to two episodes of decompensation, each of extended duration.  (R. 19.)

In support of this finding, the ALJ cited Exhibits 12F and 16F. (R. 19, 22-23)  Exhibit 12F is Dr. Bendit's March 2003 report.  (R. 396-99; see § II-A-8, supra.)  The ALJ reasoned as follows:

> In March 2003, Dr. Bendit stated that the claimant was alert, oriented, had moderate anxiety, with the claimant displaying no cognitive deficits, hallucinations or delusions.  Dr. Bendit also noted that the claimant was "75-80% back" to normal functioning.  This report indicated no impairments as to activities of daily living and social functioning, with only concentration affected to the extent that the claimant could not make complex decisions.  This report implies that the claimant was gradually improving to the point where he was beginning to attend business activities before the 12 month durational requirement.  The report dated April 2005 . . . indicates that the claimant was significantly more impaired.  As I accord greater weight to the initial report, by March 2003, as indicated by Dr. Bendit, the claimant was no longer significantly impaired.  Thus, the claimant's mental impairment did not meet the 12 month durational requirement.

(R. 23; see R. 396-99) (internal citations omitted).  The ALJ also relied on Exhibit 16F -- a report completed by a DDS psychologist following his October 2003 evaluation of Mr. Bloom.  (R. 19, 22; R. 413-27, especially 424; see § II-A-10, supra.)

### 4.  Residual Functional Capacity

Before an ALJ advances to the fourth step, he or she must assess the claimant's "residual functional capacity" ("RFC"), which is to be used at the fourth and fifth steps.  20 C.F.R. § 404.1520(a)(4), (e).  RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular

and continuing basis.  S.S.R. 96-8p.  The ALJ must consider even those impairments that are not "severe."  20 C.F.R. § 404.1520(a)(2).

The ALJ made the following finding as to Mr. Bloom's RFC:

> [W]ithin 12 months of the alleged onset date, the claimant regained the [RFC] to lift/carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk at least 6 hours in an 8 hour workday; [sit (with normal breaks) for a total of 6 hours] in an 8 hour workday; occasionally climb, and frequently balance, stoop, kneel, crouch and crawl (Exhibit 11F).  Additionally, due to his emotional impairment, the claimant was limited in making complex or detailed decisions, but was capable of making simple, routine, and repetitive work activities during the relevant period (Exhibits 16F and 17F).

(R. 20.)  The ALJ relied on a number of exhibits in arriving at this conclusion.  First, he accorded greater weight to Dr. Bendit's March 2003 report than to his April 2005 report, as indicated above.  (R. 23; see R. 396-99, 439-62; see §§ II-A-8, 11, supra.)  Second, the ALJ cited Exhibit 14F (a report completed by a DDS psychiatrist following his October 2003 evaluation of Mr. Bloom) in support of Dr. Bendit's March 2003 report.  (R. 23, 406-12; see § II-A-10, supra.)  The ALJ next stated that "no treating or consulting physician indicated that the claimant was more than moderately impaired by [his sarcoidosis]." (R. 23.)  In support of this assertion, the ALJ noted that Dr. Karpers of DDS found in his May 2003 exam of plaintiff that: Mr. Bloom's lungs were clear; his vital signs were normal; his heart sounds were normal; and he had no neurological deficits.  (R. 23, 382-86; see § II-A-10 supra.)  Fourth, the ALJ stated that the fact that Mr. Bloom paid himself $233,389 in 2002 and $188,315 in 2003; altered a payment arrangement; and changed his mind on a business merger, indicate that he provided substantial services to his business.  (R. 23.)  The ALJ

22

also noted that Mr. Bloom vacationed for a month in early 2003.   Id.
"In sum," the ALJ stated, the record fails to support the length and
extent of the claimant's inability to perform work activities,"   Id.

     The ALJ acknowledged that, in reaching his conclusion, he
considered the opinions and findings of state agency medical
consultants that Mr. Bloom could perform a wide range of light
exertional activities.  (R. 23.)  Specifically, a DDS physician found
that in September 2003, Mr. Bloom was able to lift and/or carry 20
pounds occasionally; lift and/or carry 10 pounds frequently; stand
and/or walk for a total of about six hours in an eight-hour workday;
sit (with normal breaks) for a total of about six hours in an eight-
hour workday; push and/or pull to an unlimited extent; climb
occasionally, and balance, stoop, kneel, crouch, and crawl frequently.
(R. 23, 388-95; see § II-A-10, supra.)  In addition, the ALJ cited Dr.
Brown's report for the proposition that Mr. Bloom "was limited in
making complex or detailed decisions, but was capable of making
simple, routine and repetitive work activities during the relevant
closed period."  (R. 23; see R. 428-29.)  The ALJ concluded:

          Although non-examining physicians render the opinions
     of state agency medical or psychological consultants,
     practitioners or reviewers, they are the opinions of
     experts in the evaluation of medical issues in disability
     claims under [the Act] and are entitled to some probative
     weight (20 C.F.R. § 416.927 and Social Security Rulings 96-
     5p, 96-6p).  I am generally relying on the state's
     determination for physical and emotional limitations
     because I am persuaded, after reviewing all physicians'
     reports, that claimant's exertional limitations are not
     more restricting than the State's assessment.  (R. 23.)

Finally, the ALJ stated that, in making this finding:

          [T]he undersigned considered all symptoms and the
     extent to which these symptoms can reasonably be accepted

as consistent with the objective medical evidence and other
evidence, based on . . . 20 C.F.R. 404.1529 and S.S.Rs. 96-
4p, 96-7p.  The undersigned has also considered opinion
evidence in accordance with . . . 20 C.F.R. 404.1527 and
S.S.Rs. 96-2p, 96-5p, 96-6p.  (R. 20.)

### 5.  Step Four

At the fourth step, the ALJ must determine whether the claimant

retained the RFC to perform his or her past relevant work ("PRW"); if

so, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), (f).

PRW is work that the claimant has done within the past 15 years, that

was substantial gainful activity, and that lasted long enough for the

claimant to learn to do it.  Id. at § 404.1560(b)(1).  In the instant

case, the ALJ concluded that Mr. Bloom was unable to perform any PRW

during the relevant closed period.  Id. at § 404.1565; (R. 24).  He

reasoned that owning an electrical supplies business is a skilled

position, and that Mr. Bloom was not capable of making complex

decisions during the relevant closed period.  (R. 24.)  This

conclusion is not at issue on appeal.  (See Paper No. 9 at 6-18.)

### 6.  Step Five

If the claimant's RFC prevents him from performing his PRW, the

burden shifts to the Commissioner at the fifth and final step.  Pass

v. Charter, 65 F.3d 1200, 1203 (4th Cir. 1995); McLain v. Schweiker,

715 F.2d 866, 868-69 (4th Cir. 1983).  At this step, the ALJ must show

that the claimant is capable of performing other work which exists in

significant numbers in the national economy, given the claimant's age,

education, work experience, and RFC.  20 C.F.R. §§ 404.1520(a)(4)(v),

(g), 404.1560(c), 404.1563, 404.1564, 404.1565, 404.1566.  If so, the

claimant is not disabled.  Id. at § 404.1520(a)(4)(v).

24

The ALJ made the following preliminary findings: Mr. Bloom was 53 years of age at the beginning of the closed period (R. 24; 20 C.F.R. § 404.1563); he has at least a high school education, and he is able to communicate in English (R. 24; 20 C.F.R. § 404.1564); and, finally, transferability of job skills is not material to the determination of disability due to Mr. Bloom's age (R. 24; 20 C.F.R. § 404.1568).

The ALJ concluded: "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant could perform during the relevant closed period[.]" (R. 24) (citing 20 C.F.R. §§ 404.1560(c), 404.1566)." (R. 24.)  The ALJ incorporated the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, as well as the VE testimony, into this analysis. (R. 24.)  The ALJ noted that Mr. Bloom's ability to perform the full range of light work has been impeded by additional limitations.  Id.  To determine the extent to which these limitations eroded the unskilled light occupational base, the ALJ cited the VE testimony. (R. 24, 501-04; § II-B-4, supra.)  The VE testified that given the claimant's age, education, work experience, and RFC, Mr. Bloom would have been able to perform, during the relevant closed period, occupations such as mail clerk, of which there are 1,500 jobs locally; cashier, of which there are 3,000 jobs locally; and order clerk, of which there are 1,000 jobs locally.  Id.  This testimony is consistent with the information in the Dictionary of Occupational Titles. (R. 24; S.S.R. 00-4p.)

The ALJ therefore concluded that Mr. Bloom had not been under a disability during the closed period. (R. 25.)

7.  Credibility Evaluation

In assessing Mr. Bloom's RFC, the ALJ recounted the testimony of Mr. Bloom and his wife given during the hearing.  (R. 20.)  Mr. Bloom testified that, during the closed period, he experienced significant leg pain, pulmonary dysfunction, and emotional problems like hearing voices, manic depression, memory deficit, and side effects from his medications.  Id.  He also testified that, during this period, his business was run by other employees, even though he collected salary. Id.  Finally, Mr. Bloom stated that he was unable to make business decisions, travel, or perform other functions.  Id.

The ALJ concluded that "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, [but his] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (R. 21.)  The ALJ then went on to assess Mr. Bloom's RFC.  Id.

III.  Standard of Review

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g).  The function of this Court is therefore not to try the plaintiff's claim de novo, but rather to leave the findings of fact to the Commissioner. Teague v. Califano, 560 F.2d 615, 618 (4th Cir. 1977).  Review by this Court is limited to deciding whether, on the whole record, substantial evidence supports the ALJ decision.  Id.  Substantial evidence is such evidence that a reasonable mind would accept as sufficient to support a conclusion.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). It consists of more than a scintilla of evidence but may be somewhat

less than a preponderance.  Id.  The evidence must be sufficient to justify a refusal to direct a verdict were the case before a jury. Id.  A reviewing court thus may not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

If the ALJ decision is supported by substantial evidence, it is immaterial whether the record as a whole might support an inconsistent conclusion, or whether a reviewing court would have reached a contrary conclusion based upon the same evidence.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

However, a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  Judicial review of an ALJ decision therefore also requires a determination of whether the ALJ applied the correct legal standards.  Hays, 907 F.2d at 1456.

Finally, hearings on applications for DIB are not adversarial proceedings.  Easley v. Finch, 431 F.2d 1351, 1353 (4th Cir. 1970). Moreover, the Act is a remedial statute and is to be broadly construed and liberally applied in favor of beneficiaries.  Dorsey v. Bowen, 828 F.2d 246, 248 (4th Cir. 1987).  A claimant is entitled to a full and fair hearing, and the lack of such a hearing may constitute sufficient cause to remand.  Sims v. Harris, 631 F.2d 26, 27 (4th Cir. 1980).

This Court has the authority, upon the pleadings and transcript of the record, to enter a judgment affirming, modifying, or reversing the ALJ decision, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g).  A reviewing court may remand the ALJ decision (1)

in conjunction with a judgment affirming, modifying, or reversing the decision, or (2) in light of additional evidence without a substantive ruling as to the correctness of the ALJ decision, provided that the claimant has shown good cause for failing to present the evidence earlier.  <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991).

IV.  Discussion

    Plaintiff raises three arguments on appeal.  First, the finding that Mr. Bloom does not have an impairment that meets or equals the criteria of Listing 12.02 or 12.04 is not supported by substantial evidence.  (Paper No. 9 at 6-9.)  Second, the ALJ did not accord adequate weight to the opinion of Mr. Bloom's treating physician, Dr. Bendit, and rejected that opinion "without providing any reasons whatsoever [for doing so]."  (<u>Id.</u> at 10-16.)  Finally, the ALJ indicated that Mr. Bloom's allegations regarding his limitations lack a reasonable basis, but failed to identify which allegations are not credible.  (<u>Id.</u> at 16-17.)  The Court rejects each of these arguments.[8]

> A.  Substantial Evidence Supports the ALJ's Decision to Accord More Weight to Dr. Bendit's March 2003 Opinion than to His 2005 Opinions regarding Plaintiff's Level of Impairment

    Plaintiff argues that the ALJ "failed to comply with 20 C.F.R. § 404.1527 in not according adequate weight to the opinion of the claimant's treating physician [Dr. Bendit] and rejecting [that

---

[8] Defendant correctly points out that Mr. Bloom's first and second arguments are intertwined.  This is because the question whether the ALJ properly found that Mr. Bloom did not meet a Listing depends on whether the ALJ accorded adequate weight to the opinion of Mr. Bloom's treating psychiatrist, Dr. Bendit.  While defendant addressed these arguments in combination, the Court will analyze plaintiff's second argument before his first.  (<u>See also</u> Paper No. 20 at 10 n. 7.)

opinion] without providing any reasons whatsoever for [doing so]."
(Paper No. 9 at 10-16.)   The Court rejects this two-part argument.

### 1.  The ALJ Properly Weighed Dr. Bendit's Opinions

In determining whether a claimant's impairment qualifies as a
"disability" under the Act, the ALJ must evaluate and weigh medical
opinions according to the following list: (1) whether the physician
has examined the claimant; (2) whether the physician has treated the
claimant; (3) whether relevant evidence supports the opinion; (4) the
consistency of the opinion with the record as a whole; and (5) whether
the physician is a specialist.  20 C.F.R. § 404.1527(d); Johnson v.
Barnhart, 434 F.3d 650, 654 (4th Cir. 2005).  The second factor (the
"treating physician's rule") generally requires the ALJ to accord
greater weight to the opinion of a treating physician.  20 C.F.R. §
404.1527(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).
This is because "these sources are likely to be . . . most able to
provide a detailed, longitudinal picture of a claimant's medical
impairments."  20 C.F.R. § 404.1527(d)(2).  If a treating source's
opinion "is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in [the claimant's] case record, [the ALJ]
will give it controlling weight."  Id.; Mastro, 270 F.3d at 178.

While the treating physician rule generally requires a court to
accord greater weight to the opinion of a treating physician, it does
not require that the opinion be given controlling weight.  Hunter v.
Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam).  Rather, per
the regulations, a treating physician's opinion as to the nature and

severity of the claimed impairment is entitled to controlling weight only if it is well-supported and it is not inconsistent with the other substantial evidence in the record.  Mastro, 270 F.3d at 178; 20 C.F.R § 404.1527(d)(2).  "By negative implication, if a physician's opinion is not supported by clinical evidence, or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).  Under such circumstances, the ALJ holds the discretion to give less weight to the opinion of a treating physician in the face of persuasive contrary evidence.  Mastro, 270 F.3d at 178; see also Craig, 76 F.3d at 590 (upholding ALJ's rejection of treating physician's opinion because the record contained persuasive contradictory evidence and treating physician's own notes contradicted his opinion).

In Johnson v. Barnhart, the claimant's treating physician opined in his September 2000 treatment notes that the claimant could perform light work.  434 F.3d 650, 655 (4th Cir. 2005).  A second assessment, completed by the treating physician in March 2002, concluded that the claimant was unable to perform any work during the same period.  Id. The ALJ discredited the second opinion, finding it unreliable because it was submitted about 19 months after the first one; it was in direct conflict with the earlier opinion; and it was not supported by any additional clinical evidence for that specific period.  Id.  See also Mastro, 270 F.3d at 178 (upholding ALJ's decision to not give opinion of treating physician controlling weight because the opinion was communicated a year after his last treatment of the claimant).

The Fourth Circuit concluded that substantial evidence supported the ALJ's finding that the physician's latter opinion was unreliable. Id. The court noted that the second opinion directly conflicted with the initial opinion, and that other evidence of record supported the initial opinion. Id. Furthermore, the physician never changed his diagnosis, but "merely stated" in the latter assessment that the claimant's condition prevented her from performing work. Id.

As explained in detail below, Johnson controls the instant case because, just like in Johnson, Dr. Bendit treated Mr. Bloom in March 2003 and rendered an opinion based on that treatment; Dr. Bendit then submitted a second opinion at a substantially later date purporting to overrule the first opinion, without any additional evidence pertaining to Mr. Bloom's condition in March 2003; and Dr. Bendit's second opinion is in direct conflict with his original opinion.

In his March 2003 report, completed about 11 and one-half months after the date of the alleged onset of disability, Dr. Bendit opined that Mr. Bloom was doing substantially better. (See R. 396.)[9] The ALJ concluded that "[t]his report implies that the claimant was gradually improving to the point where he was beginning to attend to business activities before the 12 month durational requirement." (R. 23.)

---

[9] Specifically, Mr. Bloom was "alert" and "oriented"; he had only "moderate anxiety [secondary] to regaining activities and functions"; and he had no gross cognitive deficits, hallucinations, or delusions. (R. 396.) Dr. Bendit also opined that Mr. Bloom had no restrictions of daily activities; that he had no difficulty in social functioning; and that he struggled to concentrate only insofar as "complex tasks" were concerned. Id. Finally, Dr. Bendit concluded that Mr. Bloom was "much better gradually but not fully back to previous level of functioning -- maybe 75-80% back." (R. 399.)

The ALJ acknowledged that "[t]he report dated April 2005, made some two years later, indicates that the claimant was significantly more impaired." Id. Notably, Dr. Bendit's 2005 opinions as to Mr. Bloom's impairment were completed and submitted more than two years after his March 2003 report was completed.  This is a greater time difference than in Johnson (less than 19 months).  See also Mastro, 270 F.3d at 178 (upholding the ALJ's decision to not give opinion of the treating physician controlling weight because the opinion was communicated about a year after his last treatment of the claimant). In 2005, Dr. Bendit opined that, during the closed period, Mr. Bloom had poor to no ability to make occupational, performance, or personal-social adjustments.  (R. 440-41.)  Dr. Bendit also opined that Mr. Bloom met Listing 12.02.  (R. 443.)  Thus, like in Johnson, Dr. Bendit's opinions are in direct conflict -- the March 2003 opinion supports a finding that Mr. Bloom could perform work, and his 2005 opinions support a finding that Mr. Bloom could not perform work.

In addition, Dr. Bendit did not supplement his 2005 opinions with any new evidence pertaining to Mr. Bloom's condition in March 2003. Rather, like in Johnson, Dr. Bendit never changed his diagnosis and "merely stated" in the latter assessment that Mr. Bloom's condition prevented him from doing work.  Johnson, 434 F.3d at 655.  Dr. Bendit explained in his 2005 letter that "[t]he report of April 1, 2005 is based on a more complete picture of his progress and recovery and is therefore more accurate."  (R. 463.)  But it is the ALJ who is charged with weighing the medical opinions, not the physicians themselves. See, e.g., 20 C.F.R. § 404.1527(d); Johnson, 434 F.3d at 654.

The ALJ carried out this charge, stating that he accorded greater weight to the initial report, like in <u>Johnson</u>. (R. 23.) As a result, "by March 2003, as indicated by Dr. Bendit, the claimant was no longer significantly impaired." <u>Id.</u> Thus, the ALJ concluded, the claimant's impairment did not meet the 12-month durational requirement. <u>Id.</u>

In light of the conflicting evidence concerning whether Mr. Bloom was capable of performing work during the closed period, the treating physician's rule applies with significantly less force. <u>See</u> <u>Craig</u>, 76 F.3d at 590; 20 C.F.R. § 404.1527(d)(2) (opinion of treating physician is entitled to controlling weight only if it is not inconsistent with other substantial evidence in the record); <u>Mastro</u>, 270 F.3d at 178 (ALJ holds the discretion to give less weight to the opinion of a treating physician in the face of persuasive contrary evidence). In any event, the Court notes that the ALJ did not disregard a treating physician's opinion in favor of a non-treating physician's opinion; rather, the ALJ gave more weight to one of a treating physician's opinions than to another one of the same physician's opinions.

### 2.   The ALJ Adequately Explained Why He Accorded Greater Weight to Dr. Bendit's March 2003 Opinion than to Dr. Bendit's Retrospective 2005 Opinions

When the ALJ does not give controlling weight to the opinion of the treating physician, the ALJ "will always give good reasons . . . for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). Furthermore, in such a situation:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's
medical opinion and the reasons for that weight.

S.S.R. 96-2p.[10]  Finally, even if the ALJ does not give the opinion of

the treating physician controlling weight, the ALJ must still consider

factors (3) through (5), above; the length of the treatment; frequency

of examination; nature and extent of the treatment relationship; and

any other relevant factors.  20 C.F.R. §§ 404.1527(d)(2)-(6).

The ALJ cited at least one exhibit in support of his decision to

give more weight to Dr. Bendit's original opinion, in accordance with

20 C.F.R. § 404.1527(d) and S.S.R. 96-2p.  Namely, he cited Exhibit 14

-- a report completed by Dr. Lehman of DDS following his psychiatric

evaluation of Mr. Bloom in October 2003.  (R. 23, 406-12.)[11]

While the ALJ did not explicitly state that he was relying on any

other exhibits in support of his decision to accord more weight to Dr.

Bendit's original opinion, it can be inferred from his opinion that he

relied on several other exhibits.  (See R. 23.)  In addition to citing

Dr. Lehman's report, for example, the ALJ cited Exhibits 16 and 17 --

reports completed by Dr. Brown of DDS following his psychological

---

[10] Social Security Rulings are interpretations by the Commissioner of
the Act.  While they do not have the force of law, they are entitled
to deference unless they are clearly erroneous or inconsistent with
the law.  Pass v. Chater, 65 F.3d 1200, 1204 n. 3 (4th Cir. 1995).

[11] Dr. Lehman opined that Mr. Bloom: had a "much improved" level of
function; had "no looseness of associations"; was not experiencing
hallucinations or delusions; did not feel depressed with regard to
anxiety states; had only "some mild short-term memory impairment"; was
only "slightly impaired" with regard to insights and judgments; had
only a "mild" severity of psychosocial stressors; had only "some
cognitive impairment"; was "functioning from a psychotic point of view
fairly well"; and had "no problems with concentration."  (R. 406-412.)

evaluations of Mr. Bloom in October 2003.[12]  (R. 413-31.)  "In sum,"
the ALJ concluded, "the record fails to support the length and extent
of the claimant's inability to perform work activities."  (R. 23.)[13]

Plaintiff argues that, because he returned to work less than two
weeks after the October 2003 DDS evaluations, those reports should not
be given significant weight.  (See Paper No. 9 at 15-16.)  The Court
agrees with this point.  However, the ALJ did not give "extensive"
weight to these opinions (Id. at 16); rather, the ALJ relied mainly on
Dr. Bendit's March 2003 report, as indicated above, and explicitly
gave the DDS reports only "some" weight in supporting Dr. Bendit's
March 2003 report.  (R. 23.)[14]  Furthermore, aside from Dr. Bendit's

---

[12] Dr. Brown opined that Mr. Bloom's impairment caused the following
functional limitations: *mild* restrictions of daily activities; *mild*
difficulties in maintaining social functioning; *moderate* difficulties
in maintaining concentration, persistence, or pace; and *one or two*
episodes of decompensation, each of extended duration.  (R. 424.)  Dr.
Brown also opined that Mr. Bloom was not significantly limited with
respect to: understanding and memory; sustained concentration and
persistence; and social interaction and adaptation.  (R. 428-29.)

[13] The ALJ also cited evidence which tends to show that Mr. Bloom's
*physical* impairment did not prevent him from working.  (See R. 23
(citing R. 382-387 -- DDS Dr. Karpers' report following his May 2003
physical evaluation of Mr. Bloom; and R. 388-95 -- report of another
DDS physician following his September 2003 physical evaluation of Mr.
Bloom).)  To the extent that the ALJ relied on these physical findings
in support of his decision to accord greatest weight to Dr. Bendit's
March 2003 opinion (as to Mr. Bloom's *mental* impairment), the Court
concludes that they are not "*good* reasons" as required by 20 C.F.R. §
404.1527(d)(2) (emphasis added).  Nonetheless, in light of the ALJ's
other reasons, this does not affect the Court's ultimate conclusion.

[14] ("[These] are the opinions of experts in the evaluation of medical
issues in disability claims . . . and are entitled to some probative
weight") (citing 20 C.F.R. § 416.927; S.S.R. 96-5p, 96-6p); see also
Paper No. 20 at 15 n. 15 ("[T]he ALJ was faced with Dr. Bendit's March
2003 opinion that Mr. Bloom was mostly recovered, and Dr. Bendit's
2005 opinion that Mr. Bloom was not able to perform any jobs as of
March 2003. . . .  [I]t was perfectly reasonable for the ALJ to

2005 opinions, there is no evidence that directly refutes Dr. Bendit's March 2003 opinion.[15]  Nor did Dr. Bendit supplement his 2005 opinions with any new evidence as to Mr. Bloom's health in March 2003.

"In short, the undersigned agrees with the ALJ's findings and conclusions, if critical of the sparseness of specific analysis and explanation."  Williams v. Halter, No. SKG-00-871, slip op. at 28 (D. Md. 2001).  "The Court's review of the record has demonstrated the correctness of the ALJ's decision, and a remand for the ALJ's explication would be futile."  Id. (citing Lively v. Bowen, 858 F.2d 177, 182 (4th Cir. 1988)); see also Barry v. Bowen, 862 F.2d 869, *2 (4th Cir. 1988) ("To remand on this point where there is not the slightest uncertainty as to the outcome of the remand would be an idle and useless formality," in a Social Security appeal) (per curiam).

There are other weaknesses in plaintiff's argument which deserve mention.  Plaintiff devotes significant attention to the findings of Dr. Bohner, one of Mr. Bloom's treating physicians.  (See Paper No. 9

---

utilize Dr. Lehman's October 2003 opinion as one factor in determining which of Dr. Bendit's conflicting opinions to accept").

[15] Dr. Bendit's actual treatment notes from early-to-mid 2003 -- as opposed to his medical summary reports and related forms -- are limited.  (See R. 461.)  Moreover, they certainly do not clearly portray an individual with the significant restrictions and level of impairment as described in Dr. Bendit's 2005 "look-back" opinion.  In February, Dr. Bendit noted that Mr. Bloom was "feeling tense all the time"; had nausea and anxiety; and had difficulty sleeping.  Id.  In March, Mr. Bloom had anxiety and feared his upcoming flight to Tennessee.  Id.  In April, Mr. Bloom felt "very guilty"; slept a lot and avoided his wife; and felt "everything was/is good."  Id.  In May, Mr. Bloom felt "scared," due largely to physical complications.  Id. In June, Mr. Bloom was worried and losing sleep, largely at the prospect of undergoing a thoracotomy.  Id.  In July, Mr. Bloom's cognitive function was "off a little"; his energy was "off"; he had "no concentration"; and he felt depressed.  Id.

at 11.)  In a letter dated October 16, 2002, Dr. Bohner noted some of

Mr. Bloom's limitations due to his sarcoidosis.  (R. 317-18.)  He went

on to conclude that he did "not believe there is any way that Mr.

Bloom would be able to engage in a competitive work environment at

this time."  (R. 318.)  However, this only shows that Mr. Bloom was

not able to work about six and one-half months after his alleged onset

of disability -- far short of the required 12 continuous months.  See

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. S 404.1505(a).[16]  Similarly,

plaintiff cites 23 pieces of evidence which allegedly show that Mr.

Bloom's physical impairment "is very prevalent throughout the record."

(Paper No. 9 at 12-13.)  However, 21 of the 23 pieces are from before

the passage of 12 months from his alleged onset of disability.  Also,

there is a four-month gap between the 21st piece of evidence (March

18, 2003) and the 22nd piece of evidence (July 11, 2003).

    In sum, the ALJ's decision to accord more weight to Dr. Bendit's

March 2003 opinion than his 2005 look-back opinions is supported by

substantial evidence.  It is not disputed that, at some points during

the closed period, Mr. Bloom was not capable of functioning.  (See

Paper No. 20 at 9.)  Where the parties disagree is regarding whether

Mr. Bloom was incapable of functioning "for a continuous period of not

less than 12 months," as required by the Act and the regulations.  42

U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  Because the ALJ gave

greater weight to Dr. Bendit's March 2003 opinion, he found that the

_____

[16] See also Paper No. 20 at 11 n. 10 (at some points during the closed
period, "it is quite likely that Mr. Bloom was unable to work. . . .
However, that would not make him disabled under the Act, unless his
inability to work was 'for a continuous period of not less than 12
months.'  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. S 404.1505(a). . . .").

continuum was broken just short of 12 months.  As indicated, the ALJ properly weighed Dr. Bendit's conflicting opinions.  While the Court does not question the credibility and professionalism of Dr. Bendit, it is axiomatic that contemporaneous notes are more reliable than post-hoc reconstructions.  There was no error in the ALJ's ruling.

### B.  Substantial Evidence Supports the ALJ's Conclusion that Mr. Bloom did not Meet or Equal a Listed Impairment

Plaintiff argues: "The ALJ's finding that the claimant does not have an impairment that meets or medically equals the criteria of section 12.02 or 12.04 of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . . is not supported by substantial evidence)."  (Paper No. 9 at 6-9) (internal citations omitted).  For the following reasons, the Court rejects this argument.

At the third step, the claimant must establish that his or her impairment or combination thereof meets or equals the criteria of one of the impairments in the Listing of Impairments ("LOI"), found in 20 C.F.R. Part 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 404.1525, 404.1526.  The impairment or combination thereof must also satisfy the duration requirement of Section 404.1509.  Id. at § 404.1520(a)(4)(iii).  That is, it must last "for a continuous period of at least 12 months."  Id. at § 404.1509 (emphasis added).

To meet or equal the severity of any Listing, the plaintiff must show that his impairment meets every criterion of a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Gowans v. Astrue, 2008 WL 179479, at *10 (D. Md. Jan. 17, 2008).  A plaintiff who shows only some of the criteria, therefore, does not qualify.  Sullivan, 493 U.S. at 531.  If substantial evidence supports the decision of the ALJ that

a criterion of the Listing is not met, then that decision must be upheld.  Jolley v. Weinberger, 537 F.2d 1179, 1179 (4th Cir. 1976).

The ALJ concluded that none of Mr. Bloom's impairments met or equaled a listed impairment.  (R. 19.)  The ALJ found that Mr. Bloom's mood disorder met the A criteria of Listing 12.04, and that his panic disorder met the A criteria of Listing 12.06.  (R. 19); see 20 C.F.R. Pt. 404, Subpt. P, App. 1.  However, the ALJ found that Mr. Bloom did not meet the B criteria of these listings.[17]  Id.  Specifically, Mr. Bloom had only mild restrictions in activities of daily living; moderate difficulties with social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and one to two episodes of decompensation, each of extended duration.[18]  (R. 19.)

In support of this finding, the ALJ cited Exhibits 12F and 16F. (R. 19, 22-23)  Exhibit 12F is Dr. Bendit's March 2003 report, which is discussed at length above.  (R. 396-99; see § II-A-8, supra.)  The

---

[17] The B criteria for Listings 12.04 and 12.06 are identical.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1.  They require that the claimant have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.  Id.

[18] Plaintiff argues he met Listing 12.02 (organic mental disorders) or 12.04 (affective disorders).  (Pl.'s Br. 6-9.)  Although the ALJ did not specifically discuss Listing 12.02, the ALJ did specifically address Listings 12.04 and 12.06 (anxiety-related disorders), finding that Mr. Bloom did not meet the B criteria or C criteria of Listings 12.04 and 12.06.  Significantly, the B criteria of Listing 12.02 are identical to the B criteria of Listings 12.04 and 12.06, and the C criteria of Listing 12.02 are identical to the C criteria of Listing 12.04.  Thus, the ALJ's finding that Mr. Bloom did not meet Listing 12.04 or 12.06, because he met neither the B criteria nor the C criteria of those Listings, is tantamount to a finding that Mr. Bloom did not meet Listing 12.02.  Mr. Bloom does not argue otherwise and appears, implicitly, to recognize this.  (See Paper No. 9 at 7.)

ALJ also relied on Exhibit 16F, which is a report completed by a DDS psychologist, Dr. Brown, following his October 2003 evaluation of Mr. Bloom.  (R. 19, 22; R. 413-27, especially 424; see § II-A-10, supra.)

Plaintiff argues that the ALJ improperly accorded more weight to Dr. Bendit's March 2003 opinion than his 2005 opinions in concluding that Mr. Bloom did not meet a Listing.  (Paper No. 9 at 7.)  Further, plaintiff argues that the ALJ accorded too much weight to the opinion of Dr. Brown because he rendered that opinion six days before Mr. Bloom returned to work.  Id. at 8.  The court rejects these arguments.

As discussed above, the question whether the ALJ properly found that Mr. Bloom did not meet a Listing depends on whether he accorded adequate weight to the opinion of Dr. Bendit.  The Court has already concluded that the ALJ properly weighed the conflicting opinions of Dr. Bendit.  For this reason, the Court concludes that substantial evidence supports the ALJ's decision that Mr. Bloom did not meet a Listing.  It is true that the ALJ also relied on the opinion of Dr. Brown.  However, the ALJ primarily relied on Dr. Bendit's March 2003 report, and used Dr. Brown's opinion only to corroborate the former. In addition, nine of the 10 pieces of evidence which plaintiff claims "support [Dr. Bendit's 2005] assessment that the claimant satisfies the B criteria of Listing 12.02" are from before the passage of 12 months from his alleged onset of disability.  (Paper No. 9 at 9.)  And there is a six-month gap between the ninth and tenth pieces of evidence – notably omitting the relatively positive opinion of Dr. Bendit in March 2003.

C.  Substantial Evidence Supports the ALJ's Conclusion that the
Claimant's Statements concerning the Intensity, Duration, and
Limiting Effects of His Symptoms were Not Entirely Credible

Plaintiff argues: "The ALJ's decision indicates that the

Claimant's allegations regarding his limitations lack a reasonable

basis.  But the decision does not identify which allegations are not

credible as required by S.S.R. 96-7p."  (Paper No. 9 at 16-17.)  For

the following reasons, the Court rejects this argument.

Under Craig v. Chater, 76 F.3d 585, 594-95 (4th Cir. 1996), the

ALJ must employ a two-part test in addressing a disability claimant's

subjective symptoms.  First, the ALJ examines whether the "claimant

has met [his] threshold obligation of showing by objective medical

evidence a medical impairment reasonably likely to cause the pain

claimed."  Id. at 595.  In the instant case, the ALJ found that,

during the closed period, "the claimant's medically determinable

impairment could reasonably be expected to produce the alleged

symptoms[.]"  (R. 21.)  Thus, Mr. Bloom met the first step.

At the second step, the ALJ must evaluate "the intensity and

persistence of the claimant's pain" and "the extent to which it

affects [his] ability to work."  Craig, 76 F.3d at 95.  It is not

sufficient for the ALJ "to make a single, conclusory statement" that

the claimant's allegations are not credible.  S.S.R. 96-7p.  Rather,

the determination "must contain specific reasons for the finding on

credibility, supported by the evidence . . . and must be sufficiently

specific to make clear to the individual and to any subsequent

reviewers the weight the [ALJ] gave to the individual's statements and

the reasons for that weight."  Id.  Finally, a claimant's allegations

about his pain need not be accepted to the extent that they are inconsistent with the available evidence.  <u>Craig</u>, 76 F.3d at 595.

In the instant case, the ALJ concluded that "the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (R. 21.)

Plaintiff argues that Mr. Bloom's testimony and his physicians' medical opinions provide sufficient evidence for a determination that he was disabled.  (Paper No. 9 at 17.)  Plaintiff further argues that the ALJ "briefly summarized the testimony of the claimant and his wife in the decision but he failed to provide a specific rationale for not finding their testimony credible[.]"  <u>Id.</u>

In assessing Mr. Bloom's RFC, the ALJ recounted the testimony of Mr. Bloom and his wife at the hearing.  (R. 20.)  Mr. Bloom testified that, during the period in question, he experienced significant leg pain, pulmonary dysfunction, and emotional problems, such as hearing voices, manic depression, memory deficit, and side effects from his medications.  <u>Id.</u>  He also testified he was not able to make business decisions, travel, or perform other functions.  <u>Id.</u>  Plaintiff also cites his Daily Activities Questionnaire, in which Mr. Bloom claims he was not able to care for himself or think clearly.  (Paper No. 9 at 17.)  Plaintiff concludes that the ALJ gave no reason for "ignoring" the questionnaire or his doctors' medical reports, which he claims illustrate the intensity and persistence of his symptoms.  <u>Id.</u>

However, the ALJ cited several "specific reasons for the finding on credibility, supported by the evidence," in accordance with S.S.R. 96-7p and 20 C.F.R. § 404.1529(c)(3).  He noted, for example:

· Dr. Bendit's March 2003 report, in which Dr. Bendit stated that Mr. Bloom was alert and oriented; he had only moderate anxiety; he displayed no cognitive deficits, hallucinations, or delusions; he was about 75 to 80 percent back to normal functioning; he had no impairments regarding daily activities and social functioning; and his concentration was affected only such that he would find it difficult to perform complex tasks.  (R. 22-23, 396-99.)

· Dr. Karpers' May 2003 opinion that Mr. Bloom was able to sit, stand, walk, lift, carry, and handle objects.  (R. 23, 386.)

· Mr. Bloom paid himself $233,389 in 2002 and $188,315 in 2003; altered a payment arrangement; and changed his mind regarding a business merger.  (R. 23.)  These all appeared to indicate that he provided substantial services to his business.  Id.

· Mr. Bloom vacationed for a month in March 2003 (i.e. before the end of 12 months after his alleged disability onset).  (R. 23.)

The cases cited by plaintiff are not to the contrary.  The courts in Rohrberg v. Apfel, 26 F.Supp.2d 303, 311 (D. Mass 1998), and Surez v. Sec'y of Health and Human Servs., 740 F.2d 1, 1 (1st Cir. 1984), recognized that the ALJ cannot ignore "uncontroverted" medical records simply because he is empowered to make credibility determinations. Aside from the fact that these decisions are not binding, the ALJ in the instant case faced medical opinions that were in direct conflict. The most notable examples are Dr. Bendit's March 2003 opinion and his 2005 opinions.  Furthermore, Dr. Bendit's March 2003 opinion served to controvert much of plaintiff's testimony.  Similarly, the court in Balsamo v. Chater, 142 F.3d 75, 81 (2nd Cir. 1998), recognized that

the ALJ failed to specify any medical opinion to rebut the treating physician's conclusion that the claimant could not perform sedentary work.  As explained above, the ALJ in the instant case cited the March 2003 opinion of Dr. Bendit, as well as the May 2003 opinion of Dr. Karpers, to rebut the 2005 opinions of Dr. Bendit that Mr. Bloom could not perform any work during the closed period.

The ALJ concededly did not lay out his explanations very fully and precisely.  But, as noted above, "the undersigned agrees with the ALJ's findings and conclusions, if critical of the sparseness of specific analysis and explanation." Williams, No. SKG-00-871 at 28. The Court's review of the record "has demonstrated the correctness of the ALJ's decision, and a remand for the ALJ's explication would be futile."  Id. (citing Lively, 858 F.2d at 182); see also Barry, 862 F.2d 869 at *2 ("To remand on this point where there is not the slightest uncertainty as to the outcome of the remand would be an idle and useless formality," in a Social Security appeal) (per curiam).

V.  Conclusion

For the above reasons, the Court AFFIRMS the decision of the Commissioner.  Accordingly, it is hereby ORDERED that plaintiff's Motion for Summary Judgment be DENIED and defendant's Motion for Summary Judgment be GRANTED.


Date: __8/7/09____                    _____/s/_____
                                      Susan K. Gauvey
                                      United States Magistrate Judge